**SIGNED THIS: May 19, 2015**

_____
**Thomas L. Perkins
United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| ARTHUR GREGORY and | ) | Case No. 13-82196 |
| DAPHNEY GREGORY, | ) | |
|             Debtors. | ) | |
| | ) | |
| CENTRAL BANK OF ILLINOIS, | ) | |
|             Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 14-8024 |
| | ) | |
| ARTHUR GREGORY, | ) | |
|             Defendant. | ) | |

**O P I N I O N**

This matter is before the Court for decision after trial on the adversary complaint filed by the Plaintiff, Central Bank of Illinois (CENTRAL BANK or the BANK), against the Defendant, Arthur Gregory (DEBTOR). The single count complaint seeks a determination of nondischargeability pursuant to 11 U.S.C. § 523(a)(2)(A). This adversary proceeding

concerns the unusual situation where a borrower and a lender had a long term relationship governed by a note and security agreement, where the borrower did not breach any of the terms of the loan documents, yet is nonetheless accused of engaging in an effort to defraud the lender.

**FACTUAL BACKGROUND**

CENTRAL BANK had a business lending relationship with the DEBTOR since 2006. At first, the DEBTOR was in the business of selling motorized bikes and small engine vehicles. By 2009, he had transitioned to selling used cars and trucks that he purchased at auto auctions. The DEBTOR operated a retail lot just down the block from CENTRAL BANK'S office in Princeton, Illinois.

The DEBTOR, operating his business as a sole proprietorship, borrowed operating funds from CENTRAL BANK that he used to purchase used vehicles through an open-end line of credit. On March 16, 2009, the DEBTOR and his wife, Jean, signed a commercial security agreement granting CENTRAL BANK a security interest in inventory held for sale and accounts receivable and other rights to payment. Although the security agreement does not grant an interest in deposit accounts, the DEBTOR does not dispute that CENTRAL BANK'S security interest extended to proceeds from the sale of inventory and that virtually all funds deposited into any bank account owned by him or his wife were such proceeds. CENTRAL BANK'S security interest was perfected with the filing of a UCC-1 Financing Statement.

Customarily, CENTRAL BANK had the DEBTOR sign a new debt instrument each year evidencing the line of credit. The instrument most recently signed by the DEBTOR

is dated March 5, 2013, which was the instrument in effect when the DEBTOR filed a chapter 7 petition on November 22, 2013. The form of the instrument is a universal note that incorporates a check-box format so that it may be adapted for both closed-end and open-end loans. The parties agree that the March 5, 2013 Note evidences an open-end line of credit with a $60,000 limit. By its terms, the Note matures on March 5, 2014, and provides that accrued interest and principal are due and payable at maturity. Despite the single payment term, the DEBTOR had a long history of making regular interest payments and frequent principal reduction payments. The Note contains a "reasonable insecurity" clause that permits CENTRAL BANK to declare a default and demand immediate payment if the DEBTOR does or fails to do something that causes CENTRAL BANK to believe it will have difficulty collecting the amount owed.

      The payment history for the line of credit for the period from and after December 24, 2012, was admitted into evidence. The line was close to being maxed out as of December 24, 2012, with a balance of $59,536 after an advance on that day of $12,725. The balance at the time of bankruptcy on November 22, 2013, was $55,053. Between the date of the Note, March 5, 2013, and July 10, 2013, the DEBTOR obtained loan advances totaling $153,903.07. During the same period, his payments totaled $153,385.79.

      After obtaining an advance on July 10, 2013, the line was maxed out at exactly $60,000. After July 10, 2013, the DEBTOR obtained no more advances and made no further principal reduction payments. Between July 29, 2013, and October, 25, 2013, he made six interest payments totaling $1,225.11.

      From 2006 until midway through 2013, the DEBTOR used a checking account at

3

CENTRAL BANK as the operating account for his business, which was the sole account into which the proceeds from car sales were deposited. As of May 22, 2013, the DEBTOR began using an account at Centrue Bank as his operating account. The Centrue account was opened in the name of Jean Gregory, but the DEBTOR was an authorized signer. Most, if not all, of the car sale proceeds were thereafter deposited into the Centrue operating account. The funds deposited into the Centrue operating account were the source of loan payments made to CENTRAL BANK on the line of credit, as well as the payment of other business expenses.

Jeff Hunt, CENTRAL BANK'S vice president since 2006, testified at trial. He testified that the DEBTOR'S customary, long-standing practice, whenever he sold a car, was to immediately repay the amount borrowed to purchase the car. Mr. Hunt testified that the DEBTOR altered his regular payment practice after July 1, 2013, when he ceased making any principal reduction payments even though he was still selling cars.

Mr. Hunt admitted that the loan documents did not require any payments other than at maturity. As reflected by the history of regular payments whenever a car was sold, however, Mr. Hunt testified that he and the DEBTOR had an unwritten understanding that the DEBTOR would continue to follow the same payment practice with respect to the line of credit. Mr. Hunt admitted that CENTRAL BANK never noted a lien on the certificate of title to any of the cars that were the DEBTOR'S inventory. Mr. Hunt also admitted that nothing in the loan documents required the DEBTOR to maintain his operating account at CENTRAL BANK, and that the loan documents did not prohibit the DEBTOR from opening and using an account at Centrue Bank. Mr. Hunt also admitted that for the time

4

period following execution of the Note on March 5, 2013, until the bankruptcy filing on November 22, 2013, the DEBTOR'S total payments on the line of credit slightly exceeded his total advances.

In early May, 2013, possibly in conjunction with a credit bureau report, Mr. Hunt asked the DEBTOR for a list of his inventory. The DEBTOR'S wife, Jean, who kept the books for his business, prepared a list of ten vehicles with values totaling $65,530. The inventory is dated May 3, 2013.

Mr. Hunt conceded that it was permissible for the DEBTOR to use sale proceeds to buy other vehicles, to pay business expenses, and to pay himself the profits realized from sales. Mr. Hunt did not claim that the DEBTOR was required to pay over all proceeds to CENTRAL BANK. He did claim, however, that the course of dealing established an expectation that from each sale the DEBTOR would repay the amount borrowed to purchase the vehicle.

Mr. Hunt testified that he did not become aware of any unusual activity until October, 2013, when he reviewed the line of credit loan. When he pulled up the loan account history, he was shocked to see that the DEBTOR had not made a principal reduction payment since July 1, 2013. Further investigation disclosed that activity in the DEBTOR'S operating account at CENTRAL BANK had dwindled and transfers where showing up from a Centrue Bank account.

After discovering this unusual activity, Mr. Hunt called the DEBTOR and demanded that he provide a list of inventory and turn over the titles to all of the vehicles. The DEBTOR initially refused, stating that he was not required to pay down the line of credit

each time he sold a car. Mr. Hunt testified that CENTRAL BANK deemed itself insecure, declared the March 5, 2013 Note to be in default and made arrangements to repossess the DEBTOR'S inventory. After the vehicles were repossessed, the DEBTOR turned over the titles. Six vehicles were repossessed and sold at foreclosure sale, generating proceeds of $15,358, which were applied to the loan. The six vehicles were different than the ones contained on the May 3, 2013 inventory list.

Mr. Hunt subsequently obtained and analyzed records from Centrue Bank for the Centrue operating account and for a "special account" at Centrue that Jean testified she used for internet sales transactions. Mr. Hunt testified that his investigation disclosed that between January and August, 2013, transfers totaling $42,647 had been made from the CENTRAL BANK operating account to Jean's personal account at CENTRAL BANK. He also concluded that between May and October, 2013, a total of $39,190 had been transferred from the Centrue operating account to Jean's personal account at CENTRAL BANK. Mr. Hunt conceded that he did not know what the funds had been used for and that some of the funds could have been used to make payments to CENTRAL BANK.

Jean testified that as of May 22, 2013, the Centrue operating account was used for the deposit of car sale proceeds and that some of the funds were paid to CENTRAL BANK. Jean testified that she paid business expenses from her personal account at CENTRAL BANK including the monthly rent payments for the car lot. Jean testified that she understood that CENTRAL BANK had a lien on proceeds from the sale of cars, even if the proceeds were deposited into a different institution such as Centrue Bank.

In addition to the line of credit loan, the DEBTOR and his wife were indebted to CENTRAL BANK on a loan secured by a mortgage on their house as well as on a smaller,

6

unsecured personal loan. Their personal vehicles were financed with other lenders.

The DEBTOR testified that there were occasions when he sold a vehicle and did not pay down the line of credit. However, he was continually reinvesting sale proceeds into new inventory, either directly or by paying down the line of credit and then obtaining new advances. The DEBTOR testified that he had a falling out with CENTRAL BANK in February, 2013, when a problem with a wire transfer caused him to lose a $12,000 sale.

Although Jean was initially named as a codefendant, she was dismissed on her motion for the reason that she had not signed the March 5, 2013 Note. Admitting that the DEBTOR made no false statement, CENTRAL BANK characterizes the DEBTOR'S actions as false pretenses, relying largely on the fact of the new operating account opened at Centrue Bank on May 22, 2013, and on the fact that no principal reduction payments were made on the line of credit after July 1, 2013. Even though the Note required nothing other than a single payment at maturity, it is CENTRAL BANK'S position that the DEBTOR'S history of routinely paying down the line with a portion of the proceeds from each sale bound the DEBTOR to continue that customary practice. CENTRAL BANK argues that the DEBTOR'S deviation from that practice after July 1, 2013, coupled with his use of a Centrue account as his operating account evidences an intent to mislead CENTRAL BANK.

The DEBTOR contends that CENTRAL BANK has failed to carry its burden to prove each of the elements of the cause of action for nondischargeability under section 523(a)(2)(A). The DEBTOR relies on the fact that all of the challenged conduct occurred after execution of the March 5, 2013 Note, that the total payments made under the Note exceeded the total advances received, and that nothing the DEBTOR or his wife did was

7

in violation of any provision of the Note or security agreement. The DEBTOR maintains that CENTRAL BANK introduced no evidence to prove that he obtained any money or property from CENTRAL BANK by false pretenses, a false representation or actual fraud.

**ANALYSIS**

Section 523(a)(2)(A) provides that a debtor is not discharged from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

In order for a creditor to obtain an exception to discharge under section 523(a)(2)(A), the creditor must show that (1) the debtor made a false representation or omission, (2) that the debtor (a) knew was false or made with reckless disregard for the truth and (b) was made with the intent to deceive, (3) upon which the creditor justifiably relied. *Ojeda v. Goldberg,* 599 F.3d 712, 716-17 (7th Cir. 2010). Once those elements are established, the creditor must then prove a loss proximately caused by its justifiable reliance. *Id.* at 721 (noting that because the statute provides an extension of credit is non-dischargeable "to the extent" obtained by a false representation, it is necessary to determine the amount "directly attributable" to the false representation). Where a series of transactions or advances is involved, section 523(a) does not provide that an entire debt is rendered nondischargeable if the creditor proves that only part of the debt was obtained by false pretenses, fraud or a false representation. *In re Luster,* 50 Fed.Appx. 781. 785-86 (7th Cir. 2002). It is only that part of the debt proved by the creditor to have been incurred or created as a result of the creditor's reliance upon the false pretenses, fraud or false representation that is

8

nondischargeable.

False pretenses may arise from implied misrepresentations, usually conveyed through conduct and material omissions, that are intended to create or foster a false impression. *In re Sturgeon,* 496 B.R. 215, 223 (10th Cir.BAP 2013); *In re Eisenstein,* 525 B.R. 428, 439 (Bankr.N.D.Ill. 2015). Even though a false statement is not a necessary element of a false pretenses claim, the creditor must nonetheless prove the element of justifiable reliance. *In re Glenn,* 502 B.R. 516, 531 (Bankr.N.D.Ill. 2013).

Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case. *Field v. Mans,* 516 U.S. 59, 71, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Blind reliance is not justifiable if the falsity would have been apparent with a cursory examination or investigation. *Id.* Red flags or warning signs, in the documents, the nature of the transaction, or the debtor's conduct or statement, undermine a creditor's claim of justifiable reliance. *Sanford Institution for Sav. v. Gallo,* 156 F.3d 71, 75 (1st Cir. 1998).

The creditor must prove each element by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor. *Matter of Scarlata,* 979 F.2d 521, 524 (7th Cir. 1992).

As a preliminary matter, this proceeding is somewhat unusual as it concerns an allegation of false pretenses by a borrower, not at the inception of the loan, but in the context of an ongoing and longstanding commercial loan relationship. Because much of the evidence related to the question of what the DEBTOR was and was not contractually

permitted to do, it is important to point out the distinction between a violation of a contract provision, which is not actionable under section 523(a)(2)(A), and fraud or false pretenses which requires an intentionally tortious state of mind. A breach of contract, even an intentional breach, is not actionable under section 523(a)(2)(A). *In re Sasse,* 438 B.R. 631, 648 (Bankr.W.D.Wis. 2010); *In re Hill,* 425 B.R. 766, 775 (Bankr.W.D.N.C. 2010). Conduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law, requiring an intent to deceive. *Cohabaco Cigar Co. v. U.S. Tobacco Co.,* 1999 WL 988805 (N.D.Ill. 1999) at *11.

The DEBTOR makes the point that even though the complaint is framed as if CENTRAL BANK had a floor plan financing arrangement with the DEBTOR, the loan documents do not support that characterization and, in fact, evidence a much less restrictive loan relationship. Floor planning is a revolving credit arrangement designed for automobile dealers, with the loan secured by the dealer's vehicle inventory and the proceeds from sale of the vehicles. *Brazell v. First Nat. Bank and Trust Co. of Rockford,* 982 F.2d 206, 207 (7th Cir. 1992). The dealer purchases vehicles with advances on the line of credit, is required to make regular interest payments, and upon the sale of a vehicle is required to repay the portion of the principal balance allocated to such vehicle. *Bank One, Springfield v. Roscetti,* 309 Ill.App.3d 1048, 1051, 723 N.E.2d 755, 758 (Ill.App. 4 Dist. 1999). Ordinarily, the lender carefully monitors the debtor's operation to make sure that principal is being repaid whenever a car is sold. This is often accomplished by the lender requiring that the debtor provide regular inventory lists and by sending an employee to the debtor's

lot to conduct a floor plan audit by visually checking the vehicles on the lot against the list of unsold inventory. *Brazell,* 982 F.2d at 208; *McHenry Sav. Bank v. Autoworks of Wauconda, Inc.,* 399 Ill.App.3d 104, 115, 924 N.E.2d 1197, 1208 (Ill.App. 2 Dist. 2010). If the debtor fails to repay the allocated principal upon sale, it is said that the debtor is "out of trust" or that the vehicle was sold "out of trust." *Brazell,* 982 F.2d at 208; *Roscetti,* 309 Ill.App.3d at 1051; *Autoworks,* 399 Ill.App.3d at 115.

Under the terms of the loan documents, the DEBTOR was not required to make regular interest payments or to pay principal each time a vehicle was sold. Neither did CENTRAL BANK regularly conduct lot checks or floor plan audits or even require the DEBTOR to submit an inventory list except on rare occasions when specifically requested. CENTRAL BANK argues that notwithstanding the single payment nature of the loan documents, the course of dealing followed by the DEBTOR created a binding obligation upon the DEBTOR to pay principal whenever a vehicle was sold. This argument, for which CENTRAL BANK cites no authorities, goes too far.

CENTRAL BANK does not dispute that the Note unambiguously requires only a single payment of principal and interest "at maturity." The maturity date is March 5, 2014. The Note provides that no modification may be made without written consent. CENTRAL BANK does not contend that a written modification was ever negotiated or obtained. The Uniform Commercial Code, which applies to promissory notes, provides that express terms prevail over an inconsistent course of performance or course of dealing. 810 ILCS 5/1-303(e)(1). While a course of dealing between the parties may be admissible to explain, supplement or add to an agreement, it may not be admitted for the purpose of

11

contradicting an agreement. *Scott v. Assurance Co. of America,* 253 Ill.App.3d 813, 818, 625 N.E.2d 439, 443 (Ill.App. 4 Dist. 1993). It is clear that the DEBTOR'S past practice of paying down principal after most sales did not effect an unwritten modification of the Note's single payment provision.[1]

The loan history reflects the following advances and payments, on a month by month basis, for January through October, 2013.

|  | **Advances** | **Payments** |
|---|---|---|
| January | $ 24,758 | $ 35,565 |
| February | 50,631 | 40,899 |
| March | 28,756 | 49,318 |
| April | 64,096 | 52,693 |
| May | 44,077 | 28,159 |
| June | 14,973 | 14,826 |
| July | 8,100 | 8,597 |
| August | 0 | 200 |
| September | 0 | 400 |
| October | 0 | 416 |
|  | $235,391 | $231,073 |

The loan balance on January 1, 2013, was $52,746. On October 25, 2013, it was $59,793. During that period, the lowest balance was $29,415 on April 1, 2013. The highest balance was $62,579 on May 21, 2013.

These figures reflect that the DEBTOR decreased his use of the line of credit at CENTRAL BANK beginning in June and ceased using it altogether as of July 10, 2013. This time frame roughly corresponds with the opening of the operating account at CENTRAL

---

[1] Evidence of a prior course of dealing is often used as a shield by a defendant to prove that he had a creditor's permission to use proceeds of collateral to pay ordinary business expenses. CENTRAL BANK is attempting to use course of dealing evidence as a sword to overcome contract terms to the contrary. This Court is aware of no Illinois precedent that permits such a result. CENTRAL BANK cites no supporting authority.

BANK on May 22, 2013. During this period, the DEBTOR was still operating his business but took no further advances from CENTRAL BANK after July 10, 2013. There is no evidence that the DEBTOR had another line of credit with any other lender. It may be reasonably inferred that when the DEBTOR stopped borrowing from CENTRAL BANK, he began using the sale proceeds that he formerly would have made principal reduction payments with to pay for new inventory. In other words, the DEBTOR stopped using borrowed funds altogether and simply bought vehicles at wholesale whenever he accumulated sufficient sale proceeds.

This is not a situation where a borrower shuts down a business, liquidates the inventory and fails to pay the proceeds to the secured lender. The DEBTOR continued to operate his car sales business until CENTRAL BANK repossessed all of his inventory in October, 2013. Based on the reduced level of inventory at that time, CENTRAL BANK sees fraud or false pretenses, inferring that the DEBTOR must have absconded with the bulk of the proceeds realized between July and October, 2013. Sufficient proof is absent, however. The BANK argues that it cannot account for the disposition of all of the vehicles owned by the DEBTOR. In the absence of a contractual obligation undertaken by a borrower to advise a floor plan lender of all inventory, or to turn over all titles, the borrower has no obligation to account for the vehicles on a regular and ongoing basis. CENTRAL BANK'S inability at trial to account for all vehicles owned and sold by the DEBTOR is not proof of fraud. *See In re Erb,* 453 B.R. 914 (Bankr.W.D.Wis. 2011).

There is no evidence in the record that the DEBTOR diverted substantial funds to

some nefarious purpose – no lavish trips, no spending sprees, no offshore accounts, no gambling losses. Jeff Hunt admitted that he had no idea how any funds were actually used by the DEBTOR and his wife.  Equally important, the record is devoid of any evidence of the sales of particular vehicles or the amount of profit, if any, made on any particular vehicle.  One alternative interpretation of the facts is that the DEBTOR failed to make sufficient profits in July, August, September and October, 2013, and instead used the sales proceeds to cover losses and pay expenses.  With the Note not due until March, 2014, the DEBTOR may reasonably have hoped to be able to pay the Note from more profitable sales in late 2013 and early 2014.  In addition, he may reasonably have anticipated that the balance would be rolled over for another year as had been done previously.

In effect, CENTRAL BANK'S argument, to succeed, would require the Court to infer an intent to deceive by the DEBTOR primarily from the fact that he stopped using the line of credit to finance his business and began using the Centrue account as his operating account.  The evidence falls far short of being sufficient to make such an inference more probable than not.  Intent to deceive is measured by the debtor's subjective intention at the time of the purportedly fraudulent conduct.  *In re Glenn,* 502 B.R. 516, 532 (Bankr.N.D.Ill. 2013). The DEBTOR testified that he became disenchanted with CENTRAL BANK because of a wire transfer snafu.  Even after he began using the Centrue account for operating purposes, he continued to use CENTRAL BANK'S line of credit for a period of weeks. The evidence fails to establish any motive for fraud that the DEBTOR had or exactly what he may have hoped to gain.  This is not a situation where the DEBTOR transferred assets to

a new entity. The DEBTOR and his wife acknowledged the continued existence of CENTRAL BANK'S security interest in sale proceeds deposited at Centrue. There is no evidence in the record that moving the operating account to Centrue was done for a purpose or with the intent to avoid paying CENTRAL BANK what was owed on the line of credit. Even if the DEBTOR'S decision not to pay down the line of credit after July 1, 2013, could somehow be characterized as a violation of an obligation under the Note and security agreement, a breach of contract by itself, even an intentional breach, is not a fraud as contemplated by section 523(a)(2)(A). *Sasse,* 438 B.R. at 648; *In re Hill,* 425 B.R. at 775.

In addition, since the DEBTOR'S use (or non-use) of the line of credit is information that was directly and constantly available to CENTRAL BANK, the element of justifiable reliance cannot be established. The fact that Mr. Hunt failed to notice that the DEBTOR had stopped using the line of credit is attributable solely to CENTRAL BANK'S loan review procedures (or lack thereof) pertaining to the loan in question, one without floor plan verification procedures. Even if Mr. Hunt believed that the DEBTOR would continue to use the line of credit as he always had, that belief does not constitute justifiable reliance for a banker with daily access to all loan activity information. Falsity which could have been discovered by a cursory examination of available information may not be justifiably relied upon. *Ojeda v. Goldberg,* 599 F.3d 712, 717 (7th Cir. 2010); *In re Guske,* 243 B.R. 359, 363-64 (8th Cir.BAP 2000).

Finally, CENTRAL BANK failed to prove a loss proximately caused by its justifiable reliance on false pretenses intentionally created by the DEBTOR. CENTRAL BANK did

not present evidence that quantifies a loss it suffered that was directly attributable to the alleged false pretenses. It offered evidence of the unpaid loan balance that remained following liquidation of the collateral in November, 2013. But the loan had a large balance at least as far back as December, 2012. This is not a situation where a debtor is alleged to have obtained a loan on account of fraud, false pretenses or a false representation. Based upon the evidence in the record, neither is this a situation where a debtor intentionally maxed out a line of credit while he was insolvent or knowing that he would be unable to repay it.

In this case, CENTRAL BANK'S theory is that the DEBTOR fraudulently failed to pay collateral proceeds. The record contains no evidence, however, that identifies any particular sale proceeds that were not paid to CENTRAL BANK as a causal result of fraud or false pretenses. CENTRAL BANK admitted account records that evidence deposits, withdrawals and transfers, but these general records do not constitute proof of a loss proximately caused by the alleged wrongful conduct. In addition, Mr. Hunt never testified what action he would have taken if he had only known of the Centrue account in May or June rather than October.[2] Moreover, there were no inventories taken after May 3, 2013, so the record is devoid of evidence of what CENTRAL BANK might have recovered if it had declared a default earlier. The element of proximate causation of a loss has not been adequately proved.

---

[2] Mr. Hunt admitted that the DEBTOR was not required to use his CENTRAL BANK account for operating purposes and that use of an account at a different bank was not an event of default. The record contains no apparent basis for CENTRAL BANK to declare a default even with knowledge of the Centrue account.

16

In its post-trial brief, CENTRAL BANK, for the first time, suggests that an alternative basis for nondischargeability is section 523(a)(6), the provision proscribing willful and malicious conduct that injures another person or entity or their property. CENTRAL BANK asserts that the DEBTOR, during his trial testimony, admitted such conduct.

Fed.R.Civ.Pro. 15(b)(2) permits issues not raised in the pleadings to be tried by the parties' express or implied consent, to the same effect as if raised in the pleadings. The standard for a motion under Rule 15(b)(2) is whether the opposing party had a fair opportunity to defend and whether he could have presented additional evidence had he known sooner the substance of the amendment. *Reynolds v. Tangherlini,* 737 F.3d 1093, 1106 (7th Cir. 2013). However, a court will not imply a party's consent merely because evidence relevant to a properly pleaded issue incidentally tends to establish an unpleaded claim. *Ippolito v. WNS, Inc.,* 864 F.2d 440, 456 (7th Cir. 1988).

The DEBTOR did not expressly consent to try a claim under section 523(a)(6). The Court determines that he also did not impliedly consent. CENTRAL BANK made no motion at trial to add a claim and there was no notice or forewarning to the DEBTOR that he would be defending a section 523(a)(6) claim. Further, the Court disagrees with CENTRAL BANK'S assertion that the DEBTOR admitted selling automobiles "out of trust." The evidence at trial unequivocally established that there was no floor plan trust arrangement. Mr. Hunt admitted that the DEBTOR had the right to sell vehicles and use the proceeds to buy other vehicles rather than paying down the line of credit. He further admitted that the DEBTOR'S use of the Centrue account as his operating account was not

in violation of CENTRAL BANK'S loan documents. Moreover, even if a section 523(a)(6) claim had been properly pleaded and tried, it would not have succeeded since the evidence failed to establish a quantifiable loss suffered by CENTRAL BANK that could be causally tied to the alleged misconduct of the DEBTOR. The measure of damages under section 523(a)(6) is the value of the converted collateral, not the debt balance. *In re Cox*, 243 B.R. 713, 720 (Bankr.N.D.Ill. 2000). The evidence in the record falls far short of proving conversion by a preponderance of the evidence.

Judgment will be entered for the Defendant. This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###